PA:CMM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION FOR A          AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT FOR:                            APPLICATION FOR A SEARCH
                                               WARRANT_____

INFORMATION ASSOCIATED WITH
INSTAGRAM USERNAME OR ACCOUNT
"AVERAGEJOE11" THAT IS STORED AT THE
PREMISES CONTROLLED BY INSTAGRAM

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

Jason O'Day, being duly sworn, deposes and states that he is an Inspector with

the United States Postal Inspection Service ("USPIS"), duly appointed according to law and

acting as such.

Upon information and belief there is probable cause to believe that there is,

located in INFORMATION ASSOCIATED WITH INSTAGRAM USERNAME OR

ACCOUNT "AVERAGEJOE11" THAT IS STORED AT THE PREMISES CONTROLLED

BY INSTAGRAM, evidence, fruits and instrumentalities of conspiracy to commit postal

money order fraud, in violation of Title 18, United States Code, Section 371, and passing and

attempted passing of forged postal money orders, in violation of Title 18, United States

Code, Section 500.

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram username or account that is stored at the premises owned, maintained, controlled, or operated by Instagram, a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Instagram to disclose to the government records or other information in its possession, pertaining to the subscriber or customer associated with the username or account.

2.      I am a Postal Inspector with the USPIS.  I have been employed by the USPIS for six years, and am currently assigned to the Brooklyn Mail Theft Team in the New York Division.  I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for the negotiation and attempted negotiation of fraudulent, altered and counterfeited postal money orders.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.      I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from:

---

[1]      Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

(a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, (c) interviews with witnesses, and (d) review of other records and reports.

4.    The USPIS is investigating the negotiation and attempted negotiation of fraudulent, altered and counterfeited postal money orders.  A grand jury sitting in the Eastern District of New York returned an indictment against defendants Daniel Allen and Ashley Duncan charging them with violations of Title 18, United States Code, Sections 371 and 500.  Based on my training, experience and the evidence set forth herein, there is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

I.    BACKGROUND

A.    Postal Money Orders With Fraudulently "Raised" Dollar Amounts

5.    The United States Postal Service (the "Postal Service") is an agency of the United States Government responsible for the issuance of postal money orders.  Postal money orders are negotiable financial instruments that are offered for sale at any United States Post office in any denomination up to a maximum of $1,000.00.  To obtain a postal money order, a customer pays cash or uses a debit card.  Once negotiated, postal money orders are routed through and paid by the Federal Reserve Bank.  The Postal Service requires that customers produce valid photo identification when cashing a postal money order at a post office.  The postal clerk must record the identification card number on the reverse side of the postal money order and verify that the individual depicted in the photo on the identification is the same person who presents the money order for cashing.

3

6.      In my training as a Postal Inspector, I have been instructed on typical fraud schemes, including "raising" the value of postal money orders. In a "raising scheme," postal money orders are purchased at a post office for a nominal amount such as $1.00, $2.00 or $5.00, and then the face amount of the postal money order is fraudulently altered by "raising" it to a much higher amount, such as $1,000.00. The resulting altered postal money order is called a "raised" postal money order. The raising of postal money orders is often accomplished in two steps. First, numbers and characters on the postal money order are removed by using chemicals or by physically abrading the paper. Second, ink jet and laser printing technology, along with computer software, is used to "raise" the value of the postal money order to the desired amount up to a maximum of $1,000.00.

7.      Each postal money order issued by the Postal Service is identified by a unique serial number. Using the unique serial number, the Postal Service is able to identify the date and time of the purchase of the postal money order, the face value of the postal money order, the location of the issuing post office, and the identity of the postal clerk who handled the transaction. This information is stored on a database maintained by the Postal Service.

8.      All negotiated postal money orders are processed and reconciled through the Postal Service Money Order Branch (the "Money Order Branch" or "Branch") in St. Louis, Missouri. Once a negotiated postal money order reaches the Money Order Branch, the Branch compares the dollar value on the negotiated postal money order against the value of the postal money order when it was originally sold by the Postal Service. If the values do not match, the postal money order is referred to the USPIS for investigation.

9.      The Postal Service suffers a financial loss for all raised postal money orders cashed at post offices. For postal money orders deposited at financial institutions, the Postal Service reserves the right to demand a refund from the presenting bank of the amount of a paid money order if, after payment, the postal money order is determined to contain an alteration not discovered on examination. Accordingly, the Postal Service and other financial institutions are defrauded when a postal money order is "raised."

B.      Daniel Allen's Postal Money Order Scheme

10.     As set forth below, from October 2010 through April 2013, Daniel Allen, also known as "Daniel Banks," "Boss Status," "Jade," "Jay Williams" and "Jayden Williams," and his co-conspirators participated in a scheme to purchase money orders at various post offices for a nominal value and then raise the face value of the money orders to a higher amount, such as $1,000.00. Allen and his co-conspirators then negotiated the raised postal money orders at various post offices and financial institutions.

11.     According to Postal Service records, on October 19, 2010, seventeen postal money orders valued at $1.00 each were purchased in one cash transaction at the Rochdale Village Station, 165-100 Baisley Blvd., Jamaica, NY 11434. The values on eight of these postal money orders were subsequently raised to $1,000.00 each and negotiated at various financial institutions.

12.     On November 1, 2010, your deponent interviewed an individual whose identity is known to the USPIS, and will be referred to hereinafter as Confidential Witness 1 ("CW 1"). On October 21, 2010, CW 1 attempted to negotiate three of the seventeen postal money orders purchased on October 19, 2010 at three post offices on Staten Island, including: the Staten Island Main Post Office, 550 Manor Rd., Staten Island, NY 10314; the

Port Richmond Station, 365 Port Richmond Ave., Staten Island, NY 10302; and the West

New Brighton Station, 1015 Castleton Ave., Staten Island, NY 10310. The values of each of

these money orders were raised from $1.00 to $1,000.00. CW 1 informed your deponent that

a person known to her as "Daniel Banks," also known as ("aka") "Boss Status," offered her

money to cash the three money orders. CW 1 provided your deponent with a photo of

"Daniel Banks," aka "Boss Status." CW 1 also informed your deponent that "Daniel Banks,"

aka "Boss Status," drove her to the aforementioned three post offices on Staten Island for the

purpose of negotiating the money orders.[2]

13.     According to Postal Service records, on March 15, 2011, ten postal

money orders valued at $7.00 each, were purchased in the same cash transaction at the

Eltingville Post Office, 4455 Amboy Rd., Staten Island, NY 10312. The values of nine of

these postal money orders were subsequently raised to $1,000.00 each and negotiated at

various financial institutions.

14.     On April 11, 2011, your deponent interviewed an individual whose

identity is known to the USPIS, and will be referred to hereinafter as Confidential Witness 2

("CW 2"). CW 2 was interviewed regarding a raised postal money order which was

deposited into her Citibank account. The postal money order was one of the ten postal

money orders purchased on March 15, 2011 in the amount of $7.00 at the Eltingville Post

Office and its value was subsequently raised to $1,000.00. CW 2 informed your deponent

that an individual known to her as "Jade" gave her the postal money order. CW 2 was shown

the photo of "Daniel Banks," aka "Boss Status," which was provided by CW 1, and CW 2

---

[2]     CW 1 and all other Confidential Witnesses referenced herein were arrested by local
law enforcement personnel for their involvement in the crimes set out in this affidavit.

identified the person in the photo as the person known to her as "Jade." CW 2 also provided

information concerning the residence of "Jade," and drove with your deponent and a

Detective from the New York Police Department ("NYPD") to "Jade's" residence. While

near the residence, CW 2 observed "Jade" inside a black BMW, bearing New York license

plate ELH 3455. Your deponent and the NYPD Detective followed the BMW. A traffic stop

was conducted after the BMW exceeded the posted speed limit. The driver of the BMW

provided the Detective with a Military Identification Card in the name of Daniel Allen. Your

deponent observed Daniel Allen and concluded that he is the same person depicted in the

photo provided by CW 1, and known to CW 1 as "Daniel Banks," or "Boss Status." Allen

was questioned and eventually released from the scene.

15.     According to Postal Service records, between April 6, 2011 and May

18, 2011, 172 postal money orders were purchased in amounts of $6.00 or $7.00 each at the

Garden City Post Office, 600 Franklin Ave., Garden City, NY 11530. Each of the 172 postal

money orders were subsequently raised to $1,000.00 and negotiated at various financial

institutions. On May 19, 2011, the Garden City Postmaster alerted Postal Inspectors on Long

Island that an individual was attempting to purchase multiple postal money orders in the

amount of $7.00 each. The Postmaster stated that this was the same individual who had

previously purchased multiple $7.00 postal money orders.

16.     Inspectors responded to the Garden City Post Office, and interviewed

co-conspirator Ashley Duncan. Duncan informed Inspectors that she drove to the Garden

City Post Office in her Ford Explorer with another individual. Postal Inspectors located

Duncan's Explorer outside the Garden City Post Office, and found it to be occupied by

Daniel Allen.  Allen was arrested but the charges against Allen and Duncan were later dropped.

17.     Postal Inspectors were informed by Duncan that she purchased nominally valued postal money orders at numerous post offices since March 2011 at the request of Daniel Allen.  Duncan also informed Inspectors that she cashed postal money orders in amounts up to $1,000.00 at multiple post offices, also at the request of Allen. Duncan informed Inspectors that she had also deposited postal money orders into various bank accounts at multiple banks in New York, at the request of Allen.  Duncan stated that Allen paid her between $200.00 and $400.00 a week during this period.

18.     On March 19, 2012, Postal Inspectors on Long Island were informed by a Detective from the Lynbrook Police Department, of a complaint alleging an assault that occurred outside of the Lynbrook Post Office, 100 Broadway, Lynbrook, NY 11563. According to the complaint, the victim alleged that she was assaulted by an individual known to her as "Jayden Williams," after refusing to re-enter the Lynbrook Post Office in order to purchase additional $1.00 postal money orders.

19.     Postal Inspectors interviewed the victim of the alleged assault.  The victim informed Inspectors that in February 2012, she cashed a postal money order in the amount of $1,000.00, at the Far Rockaway Post Office, 1836 Mott Ave., Far Rockaway, NY 11691, at the request of "Jayden Williams."   Additionally, the victim stated she cashed two additional $1,000.00 postal money orders at post offices in Brooklyn, NY at the request of "Jayden Williams."  The victim also informed Inspectors that on March 19, 2012, "Jayden Williams" drove her to four post offices on Long Island, where she purchased multiple postal

money orders in the amount of $1.00 each.  She stated that "Jayden Williams" assaulted her after she refused to re-enter the Lynbrook Post Office to buy additional postal money orders.

20.    Lynbrook Police Officers informed Inspectors that a witness to the assault observed the perpetrator drive away from the scene in a vehicle bearing the New York license plate FJP6506.  According to records maintained by the New York Department of Motor Vehicles, the vehicle was registered to an individual whose identity is known to the USPIS, and will be referred to here as the "car owner."

21.    Your deponent was informed that on March 26, 2012, Lynbrook Police Officers observed the vehicle bearing New York license plate FJP6506 in Brooklyn, NY, being driven by an individual who matched the description of the alleged assaulter. Lynbrook Police Officers conducted an investigative stop of the vehicle.  The driver produced a Military ID Card in the name of "Daniel Allen."  Allen was questioned and released.

22.    Postal Inspectors were informed by Lynbrook Police Officers that the vehicle was impounded on March 26, 2012 and an inventory search of the vehicle was conducted.  Fifteen $7.00 postal money orders and two $1.00 postal money orders were recovered from the vehicle.  Your deponent was informed that all fifteen $7.00 postal money orders were purchased at the Garden City Post Office on May 19, 2011, and both of the $1.00 postal money orders were purchased at Lynbrook Post Office on March 19, 2012.

23.    According to Postal Service records, on September 17, 2012, (1) two postal money orders valued at $2.00 each were purchased at the Mt. Holly Post Office in Mt. Holly, New Jersey, and (2) two postal money orders valued at $7.00 and one postal money order valued at $10.00 were purchased at the Rancocas Post Office in Rancocas, New Jersey.

The values on these five postal money orders were subsequently raised to $1,000.00 each and negotiated at various post offices in Waltham and Boston, Massachusetts.

24.     On July 16 and 18, 2013, your deponent interviewed an individual whose identity is known to the USPIS, and will be referred to hereinafter as Confidential Witness 3 ("CW 3"). CW 3 was interviewed regarding the negotiation of five postal money orders on October 4, 2012 at various post offices in Waltham and Boston, Massachusetts. These five postal money orders were the postal money orders that had been purchased on September 17, 2012 at the Mount Holly and Rancocas Post Offices, in which the value was subsequently raised to $1,000.00. CW 3 informed your deponent that she met a person known to her as "Chris" on Instagram and that his Instagram name was "averagejoe11." CW 3 further informed your deponent that "Chris" asked her to take a trip with him, and that they drove to Massachusetts. CW 3 stated that, during this trip, "Chris" used a Global Positioning System ("GPS") on his iPhone to locate post offices and that "Chris" asked her to negotiate postal money orders at various post offices. CW 3 was shown a photo array and identified defendant Allen as the individual known to her as "Chris."

25.     CW 3 further stated that in the days immediately following the October 2012 trip to Massachusetts, "Chris" called her several times and she did not answer the phone. The last time "Chris" called CW 3, CW 3 answered the phone and told him to stop calling her or she would call the police. Following this phone call, "Chris" blocked CW 3 from his Instagram account. CW 3 stated that "Chris" posts pictures of himself with a lot of cash, cars and jewelry on Instagram.

26.     On April 22, 2013, an individual supervising the New Rochelle Post Office, 255 North Ave., New Rochelle, NY 10801 informed Postal Inspectors that an

individual attempted to cash a postal money order in the amount of $1,000.00. The postal money order was made payable to "Daniel Allen" and the individual presented a New York State Identification card #790 021 310 bearing the name "Daniel Allen." The postal clerk who handled the transaction was suspicious of the postal money order and reached out to her supervisor. At that point, the individual who presented the postal money order and the Identification Card fled the post office, leaving the postal money order and Identification Card behind. Your deponent has reviewed the Identification Card and believes that the picture on the card is that of Daniel Allen. The postal clerk was also shown a photo array that included Allen and positively identified him. A review of Postal Service records indicated that the postal money order was originally purchased for $1.00 on March 26, 2013 at Boulevard Station Post Office, 1132 Southern Boulevard, Bronx, NY 10459.

27.     Based on Postal Service records, between October 2012 and April 2013, approximately 125 additional raised postal money orders were cashed, in the Eastern District of New York and elsewhere, that are attributable to Daniel Allen.

28.     On April 30, 2013, a complaint and arrest warrant were issued against Daniel Allen.

29.     On May 10, 2013, Allen was arrested in Brooklyn, New York.

30.     On June 7, 2013, a Grand Jury returned an indictment against Allen charging him with passing and attempted passing of forged postal money orders, in violation of Title 18, United States Code, Section 500. On July 12, 2013, a Grand Jury returned a superseding indictment against Allen and Duncan charging them with conspiracy to commit postal money order fraud, in violation of Title 18, United States Code, Section 371, and

passing and attempted passing of forged postal money orders, in violation of Title 18, United States Code, Section 500.

II.   INSTAGRAM

31.   Instagram is a free-access social networking website that can be accessed at http://www.instagram.com. Instagram allows its users to establish accounts. Instagram was developed and operated by a company of the same name, and was recently acquired by Facebook. Users can also log into Instagram using an existing Facebook account. Users can then use their accounts to share photographs with other Instagram users, and sometimes with the general public. Users can also attach captions (brief textual descriptions) of photographs that are shared along with the photographs.

32.   Instagram asks users to provide basic contact and personal identifying information to Instagram, either during the registration process or thereafter. This information may include the user's full name, gender, contact e-mail addresses, Instagram password, telephone numbers, a personal biography, websites, an account photograph, and other personal identifiers.

33.   Instagram users can choose to "follow" other Instagram users. In most cases, any photographs posted by an Instagram user are instantly visible to all of their "followers." Followers can also comment on other users' photographs, and "like" other users' photographs. This "like" feature allows users to give positive feedback on particular photographs.

34.   Instagram users can choose to make their profiles "private," in which case they must approve other users' requests to "follow" them. If a user's profile is not "private," any

other user may follow them – and see their posted photographs – without their knowledge or approval.

35.    Photographs on Instagram may contain "Metadata," which is technical data embedded into the photographs themselves by users before uploading them to Instagram. Users may also choose to attach additional Metadata to photographs after they have been uploaded to Instagram. Metadata can include, but is not limited to, the time at which a photograph was taken, the device that was used to take the photograph, and the latitude and longitude at which the photograph was taken. All of this information may be stored by Instagram.

36.    Instagram also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Instagram, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views an Instagram profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

37.    Instagram also retains logs of the device identifiers of any mobile device that a user uses to connect to Instagram. These identifiers uniquely identify each mobile device. These logs may contain information about the actions taken by the user ID or device identifier on Instagram, including information about the type of action, the date and time of the action, and the user ID and device identifier associated with the action. For example, if a user views an Instagram profile, that user's device identifier log would reflect the fact that the user viewed the profile, and would show when and from what device identifier the user did so.

38.     Social networking providers like Instagram typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Instagram users may communicate directly with Instagram about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Instagram typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

39.     Therefore, the computers of Instagram are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, transaction information, and other account information.

III.    CONCLUSION

40.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that evidence of the crimes can be found in INFORMATION ASSOCIATED WITH INSTAGRAM USERNAME OR ACCOUNT "AVERAGEJOE11" THAT IS STORED AT THE PREMISES CONTROLLED BY INSTAGRAM. Accordingly, a search warrant is requested.

41.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Instagram to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of

Attachment B.  Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in

Section II of Attachment B.

42.     This Court has jurisdiction to issue the requested warrant because it is "a

court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711.  18 U.S.C. §§ 2703(a),

(b)(1)(A) and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that –

has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

43.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer

is not required for the service or execution of this warrant.

WHEREFORE, your deponent respectfully requests that the requested search

warrant be issued for INFORMATION ASSOCIATED WITH INSTAGRAM USERNAME

OR ACCOUNT "AVERAGEJOE11" THAT IS STORED AT THE PREMISES

CONTROLLED BY INSTAGRAM.


_____
Jason O'Day
Postal Inspector
United States Postal Inspection Service


Sworn to before me this
19th day of July, 2013

s/ *Cheryl L. Pollak*
_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the Instagram username or account "averagejoe11" that is stored at premises owned, maintained, controlled, or operated by Instagram, a company headquartered in Menlo Park, California.

16

## ATTACHMENT B

Particular Things to be Seized

I.    Information to be disclosed by Instagram

To the extent that the information described in Attachment A is within the possession, custody, or control of Instagram, including any messages, records, files, logs, or information that have been deleted but are still available to Instagram, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Instagram is required to disclose the following information to the government for the username or account listed in Attachment A for the period of time from January 1, 2010 to the present:

(a)    All contact and personal identifying information, including full name, gender, contact e-mail addresss, Instagram passwords, telephone numbers, screen names, websites, device identifiers, and other personal identifiers;

(b)    All activity logs for the account and all other documents showing the user's posts and other Instagram activies;

(c)    All photos and comments uploaded by that username or account and all photos and comments uploaded by any user that have that user tagged in them; all metadata associated with all photos uploaded by that username or account and all photos uploaded by any user that have that user tagged in them;

(d)    All profile information; links to video, photographs, articles, and other items; lists of those "followed" by the user; lists of all those "following" the user; rejected "follow" requests; and information about the user's access and use of Instagram applications;

(e)    All records of the account's comments on other photos, including all photos that the user has commented on;

(f)    All "check ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account; all device identifier logs, including all records of the device identifiers that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all photos that the user has "liked";

(i)      All records of searches performed by the account;

(j)      The types of service utilized by the user;

(k)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(l)      All privacy settings and other account settings;

(m)    All records pertaining to communications between Instagram and any person regarding the user or the user's Instagram account, including contacts with support services and records of actions taken;

(n)     All records of Facebook accounts used to log into the user's Instagram account, or to view, like, or comment on any of the user's posted photographs, including the Facebook identification numbers of those accounts and any other related Facebook information associated with the user's Instagram account.

II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 371 and 500 involving defendants DANIEL ALLEN, also known as "Daniel Banks," "Boss Status," "Jade," "Jay Williams," and "Jayden Williams," and ASHLEY DUNCAN.

18

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury

under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that

the information contained in this declaration is true and correct. I am employed by

Instagram, and my official title is _____. I am a

custodian of records for Instagram. I state that each of the records attached hereto

is the original record or a true duplicate of the original record in the custody of

Instagram, and that I am the custodian of the attached records consisting of

_____ (pages/CDs/kilobytes). I further state that:

a.     all records attached to this certificate were made at or near the
       time of the occurrence of the matter set forth, by, or from
       information transmitted by, a person with knowledge of those
       matters;

b.     such records were kept in the ordinary course of a regularly conducted
       business activity of Instagram; and

c.     such records were made by Instagram as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the

Federal Rules of Evidence.


_____

Date                                                        Signature


19